MacKnight Flintic Stone Company, Appellant, *v.* The Mayor, Aldermen and Commonalty of the City of New York, Respondent.

1. MUNICIPAL CONTRACT — CONTRACTOR NOT A GUARANTOR OF SUFFICIENCY OF PLAN AND SPECIFICATIONS PREPARED BY MUNICIPALITY TO PRODUCE RESULT DESIRED. Where a municipal contract provides that the contractor shall furnish the materials and labor for the purpose, and accomplish a certain result, such as to make an underground room water tight, "in the manner and under the conditions set forth in the annexed specifications," and the specifications were prepared by the municipality and contain a detailed plan from which the contractor had no right to depart, the contractor, in the absence of express terms or necessary implication, is not to be deemed a guarantor of the sufficiency of the plan and specifications to produce the result desired, and his contract is performed if he has furnished the materials and done the work according to the plan and specifications, and thus made the room as water tight as the plan and specifications permitted.

2. Contractor's Guaranty of Materials and Workmanship, not of Plan. Where such contract provides for payment when the work is done, a provision that the contractor will turn the work over to the municipality "in perfect order and guaranteed absolutely water and damp proof for five years from the date of the acceptance of the work," is not a guaranty of the perfection of the plan, but of the materials and workmanship, and its effect is to make the contractor responsible for dampness or water breakage caused by such defects only.

3. Contractor's Right to Payment on Unreasonable Refusal of Certificate. If the work under such contract has been faithfully performed according to the plan and specifications, and the failure to secure a water-tight room is wholly owing to the defective design of the municipality, the contractor is entitled to recover payment notwithstanding the refusal of the designated official to give the certificate required by the contract as a condition precedent to payment, for under those circumstances it is his duty to give it, and a refusal to do so is unreasonable.

*MacKnight Flintic Stone Co.* v. *The Mayor*, 31 App. Div. 232, reversed.

(Argued June 9, 1899; decided October 3, 1899.)

Appeal from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered July 14, 1898, affirming a judgment in favor of defendant entered upon a dismissal of the complaint upon the merits at a Trial Term.

This action was brought to recover moneys alleged to be due under a contract between the plaintiff and defendant, and also to recover for the performance of work in connection therewith at an increased cost.

In October, 1894, the defendant entered into a contract with one Murphy by which the latter agreed to erect a court house and prison for the use of certain police and district courts in the city of New York. Before that contract could be fully performed, it became necessary to do additional work in order to properly complete the building, and accordingly the defendant caused a plan and specifications for the same to be prepared by its engineer, advertised for proposals, and the supplementary contract was awarded to the plaintiff as the lowest bidder. By this contract the plaintiff agreed to furnish "all the materials and labor for the purpose and make water tight the boiler room, coal room, cellar, etc., of the court

house and prison   *   *   *   in the manner and under the con-
ditions prescribed and set forth in the annexed specifications,
which are hereby made part of this contract." It was agreed
that the commissioner of public works might appoint an
inspector to inspect the materials furnished and the work done
under the agreement and to see that the same corresponded
with the specifications and the terms of the contract. The
plaintiff agreed to forthwith remove all materials "whether
worked or unworked, which the said foreman or inspector"
should "adjudge unsound, improper or not corresponding
with the said specifications and the terms of this contract, and
will within a reasonable time furnish proper materials in lieu
thereof; and in case any work shall be condemned by the said
foreman or inspector as defective or improperly done, such
defective work will be remedied as he shall direct; and if
said contractor refuse or neglect to remove such materials and
furnish proper materials in lieu thereof, or remove such defec-
tive work as aforesaid, said commissioner may proceed to
remove said materials or remove said work and complete the
same in the proper manner at said contractor's expense."

The cellar floor was twelve feet below the curb line and the
floor of the boiler room was about twenty-six feet below, so
that owing to the depth and to the probability that the floor
was below tide level, it was expected that in this room there
would be water pressure from below. The specifications
required the contractor to place in the boiler room a four-inch
layer of Portland cement concrete, made of specified mate-
rials mixed in designated proportions, and to place over the
floors and up the sides of the walls to a certain height "a
water-proof lining, composed of six layers of roofing felt,
solidly cemented together and coated with hot asphaltic
cement."

"In order to protect the iron columns in the cellar   *   *   *
this water-proof lining" was to be carried "up around them
seven feet above the finished floor," and "three-sixteenth-inch
boiler iron sleeves four inches larger than the columns" were
to be placed outside the water proofing, and the space between

the iron and water proofing filled with Portland cement mortar.   Over the four-inch floor twelve inches of Portland cement was to be placed, "inclosing a sufficient framing of twelve-inch steel beams, each weighing forty pounds per foot, to resist the upward pressure of the water."   The top finish was to be made of "one course of Haverstraw brick, edged and grouted,   *   *   *   with mortar formed of one half Portland cement and one-half clean, sharp sand."

For the protection of the water proofing on the walls other brick walls were to be constructed, "laid in Portland cement mortar, the first thirty inches, sixteen inches thick; the next three feet, twelve inches thick; the next three feet, eight inches thick, and the remainder, to within eighteen inches of the iron beams, four inches thick."   The specifications further stated that "the balance of the cellar is supposed to be above water pressure; and if such" were "found to be the case" a less expensive method of construction was authorized as to that part of the work.

The materials were to be subject "to inspection and approval of any inspector appointed by the department of public works and the architect and engineer in charge, and any work or material deemed unsatisfactory by any or all of them will be removed and replaced with such as will meet with their approval."

The specifications also contained the following: "The entire cellar, areas, etc., are to be protected after the work is done, in such manner that the other mechanics will not injure them; but if such injury should occur the work must be made good by the contractor, and at the entire completion of the building all of the work must be gone over by the contractor and turned over to the city by him in perfect order and guaranteed absolutely water and damp proof for five years from the date of the acceptance of the work.   Any dampness or water breakage within that time must be made good by the contractor without any cost or expense to the city."

The right was reserved to the commissioner "to alter the specifications in a manner not materially affecting their sub-

stance, nor increasing the amount to be paid,   *   *   *   in order to more fully carry out the work contemplated."

Upon performance of the contract, in accordance with the specifications, the superintendent was to give the contractor a certificate to that effect as a condition precedent to his right to receive the contract price of $8,366.

. The work was done under the superintendence of the engineer who drew the specifications and the superintendent of public works, both of whom were officers of the defendant. An inspector was also appointed, who examined the work every day as it progressed and passed on the materials that were used. No objection was ever made by any representative of the city to the method of doing the work or to the materials used, and no request was made to remove any of the materials or to do any part of the work in a different manner. Evidence was given tending to show that every requirement of the plans and specifications as to materials furnished and work done had been literally complied with, except that more work was done and more materials used in some places than the contract called for.

When the plaintiff commenced performance of the contract there was an ejector or automatic pump in the boiler room, which had been placed there by Mr. Murphy, the contractor who erected the building. Upon the completion of the work by the plaintiff this ejector, which had been used by him to pump out the water from the cellar, was removed from the floor, and on the 11th of November, 1895, a week after the completion of the work, the cellar was found dry and in good condition. Thereupon the plaintiff demanded of the superintendent and architect the certificate necessary to obtain payment for performance of the contract, but it was not given him. About the 15th of November there was a heavy rain, and the cellar of the boiler room, which was outside of the main building, had not then been covered with a roof by the general contractor. The conductors to carry the water from the roof of the building had not been completed, and the result was that the rain from the entire building poured

through the conductors into the boiler room.   Much water thus accumulated in the cellar and remained there until the brick walls became thoroughly saturated, and ice was formed to the depth of two or three feet on the floor.   On the 11th of December the plaintiff was requested by the architect to pump the water out, so that the cellar could be tested.   Permission was thereupon asked by the plaintiff to replace the old Murphy ejector in order to remove the water, and a permit was given accordingly.   The ejector was put in, but after the water had been partly pumped out it did not work well, and was replaced by a new one with the knowledge of the inspector.   After the removal of the water the walls and floors were dried by stoves; the places where any dampness appeared were pointed up and the whole surface covered with Portland cement.   There was evidence tending to show that the cellar was then left "in a first-class, dry condition."   Soon, however, there was dampness in the boiler room, but the cause did not appear.   Water was seen to ooze through by two jackets around columns in that room early in February, but after the 24th of February it was absolutely dry.   The ejector, however, which was operated by Croton water, was left in operation by the plaintiff.   It was not in sight and was controlled by a faucet, so that it could be set in motion or kept quiet, as was desired.

The certificate was still refused, and the plaintiff submitted a plan for additional work in the boiler room, which it claimed, although not required by the specifications, would put it in an absolutely water-proof condition, but the defendant did not permit such work to be done.   The defendant finally took possession of the building, put in its boilers, coal bins, electric apparatus, etc., and has used the premises, including the work done by the plaintiff, since the summer of 1896.   The cellar and coal room, which have a surface of 7,100 square feet, are admitted to be water proof, but the boiler room, with a surface of 1,900 square feet, is not, as claimed by defendant, entirely water proof, but it is claimed by plaintiff that owing to the water pressure from below, it cannot be made absolutely

water proof without adopting a new method of construction. Substantially the only place where any leakage is apparent when the ejector is not at work is around the jackets.

The evidence tended to show that the materials and construction complied with the contract and specifications in every respect. The cellar is now perfectly dry, but the ejector is there, and there was evidence that the cellar would not be dry if the ejector were removed. There was some evidence tending to show that a part of the materials required by the specifications were of an improper pattern, and the inference was permissible that a water-proof condition could not be produced by following the specifications.

At the close of the evidence the complaint was dismissed, although the plaintiff asked to go to the jury upon the question of substantial performance, waiver of the conditions of the contract, and on the whole case, but the request was denied and the plaintiff excepted. After affirmance by the Appellate Division the plaintiff appealed to this court.

*L. Laflin Kellogg* and *Alfred C. Petté* for appellant. The defendant warranted that the plans and specifications were suitable and efficient for the purpose for which they were designed, and the plaintiff having contracted to do the work according to those plans and specifications, and having done its work in exact accordance therewith, is entitled to recover the full contract price, whether or not the purpose designed was accomplished; the plaintiff was not a guarantor of the efficiency of the plans and specifications. (*Hoe* v. *Sanborn*, 21 N. Y. 552; *Cunningham* v. *Hall*, 86 Mass. 268; *Bancroft* v. *S. F. T. Co.*, 120 Cal. 228; *Bentley* v. *State*, 73 Wis. 416; *Byron* v. *Mayor, etc.*, 22 J. & S. 411; *Doll* v. *Noble*, 116 N. Y. 230; *City of Brooklyn* v. *B. C. R. R. Co.*, 47 N. Y. 475; *Smith* v. *C. C. O. Co.*, 86 Fed. Rep. 359; *Weld* v. *Goldberg*, 65 Fed. Rep. 466; *Murphy* v. *L. Nat. Bank*, 184 Penn. St. 208.) The plaintiff having performed its work in good faith according to the plans and specifications, the demand for and unreasonable refusal of the certificate called

for under the contract obviated the necessity of its production, and the plaintiff was entitled to recover without it. (*B. Nat. Bank* v. *Mayor, etc.*, 63 N. Y. 336; *Thomas* v. *Fleury*, 26 N. Y. 26; *Nolan* v. *Whitney*, 88 N. Y. 648; *Byron* v. *Low*, 109 N. Y. 295; *Smith* v. *Alker*, 102 N. Y. 87; *Woodward* v. *Fuller*, 80 N. Y. 312.) Even conceding that the obligation was upon the plaintiff to make the cellar water tight at all events, it was error to dismiss the complaint, because the evidence showed full compliance by the plaintiff in good faith with the plans and specifications in the doing of the work, and it was entitled to the verdict of the jury on the question of substantial performance of the terms and conditions of the contract under the facts and circumstances shown in this case. (*Nolan* v. *Whitney*, 88 N. Y. 648; *Woodward* v. *Fuller*, 80 N. Y. 312; *Philip* v. *Gallant*, 62 N. Y. 256; *Flaherty* v. *Miner*, 123 N. Y. 382; *Heckmann* v. *Pinkney*, 81 N. Y. 211; *Oberlies* v. *Bullinger*, 132 N. Y. 598; *Desmond Co.* v. *Friedman Co.*, 16 App. Div. 141; *Murphy* v. *S. S. Co.*, 82 Hun, 158; *D' Andre* v. *Zimmermann*, 17 Misc. Rep. 357; *Monteverde* v. *Bd. Suprs.*, 78 Hun, 267.) It was error to refuse to submit the case to the jury, because the taking possession and user by the city of the completed work was of itself sufficient evidence to justify a finding by the jury that the defendant accepted the work as complete under the contract, or at least such performance of the contract as would preclude the defendant from claiming that the plaintiff had not substantially performed so as to entitle it to recover the contract price less any damages which the defendant might have suffered by reason of the lack of full performance. (*Smith* v. *Alker*, 102 N. Y. 87; *Brown* v. *Foster*, 108 N. Y. 388; *O. I. Co.* v. *Roach*, 117 N. Y. 528; *Chambers* v. *Lancaster*, 3 App. Div. 215; *Wiles* v. *Provost*, 6 App. Div. 1; *Ellison* v. *Creed*, 34 App. Div. 15; *Brady* v. *Cassidy*, 145 N. Y. 171; *Parke* v. *F. A. T. Co.*, 120 N. Y. 51; *Avery* v. *Willson*, 81 N. Y. 341.) The covenant upon the part of the contractor to keep the cellar water tight for a period of five

years was predicated upon the fact that it was possible to make the cellar water tight according to the plans and specifications, but even if it was a covenant to keep it water tight at all events, the performance of that covenant was not a condition precedent which would prevent recovery for the work done, but simply a condition subsequent which would entitle the defendant to damages sustained by reason of the breach. (*Gilligan* v. *Brown,* 116 Cal. 554.)

*John Whalen, Corporation Counsel* (*Chase Mellen* of counsel), for respondent.    The burden was upon the plaintiff to prove, or to make out a *prima facie* case to the effect that it had completed the work in substantial accordance with the plans, specifications and conditions of the contract.    The plaintiff's testimony shows beyond possibility of doubt, that it did not complete the work in accordance with the same, either substantially or otherwise, but substituted a construction of its own for that specified in the contract.    (*Woodward* v. *Fuller*, 80 N. Y. 312; *Miller* v. *Benjamin*, 142 N. Y. 613; L. 1882, ch. 410, § 64; *Bonesteel* v. *Mayor, etc.*, 22 N. Y. 162; *M. F. S. Co.* v. *Mayor, etc.*, 13 App. Div. 235; *Thorn* v. *Mayor, etc.*, L. R. [1 App. Cas.] 120; *La Chicotte* v. *R. R. & L. Co.*, 15 App. Div. 380; *Wiley* v. *Athol*, 150 Mass. 426; 2 Chitty on Cont. 1074; *Paradine* v. *Jane*, Aleyn, 26; *Dauchey* v. *Drake*, 85 N. Y. 407; *Lake* v. *McElfatrick*, 139 N. Y. 349.)    The city did not waive performance of the contract, or completion in accordance with the specifications, nor did it accept the work in the condition in which it was delivered by the plaintiff as a performance of the contract. (L. 1882, ch. 410, § 64; *Bonesteel* v. *Mayor, etc.*, 22 N. Y. 162; *Stuart* v. *Cambridge*, 125 Mass. 102; *Bennecke* v. *C. M. L. Ins. Co.*, 105 U. S. 359; *Balfour* v. *Parkinson*, 84 Fed. Rep. 855; *Sumpter* v. *Hedges*, L. R. [1 Q. B. 1898] 673; *Elliott* v. *Caldwell*, 43 Minn. 357; *Woodward* v. *Fuller*, 80 N. Y. 312; *Wildey* v. *School Dist.*, 25 Mich. 419; *Crane* v. *Knubel*, 43 How. Pr. 389; *Reed* v. *Board, etc.*, 3 Keyes, 105.)    The contract measured the rights of the parties, and

the plaintiff could not vary its terms without the consent of the defendant. No such consent was given. (*Smith* v. *Brady*, 17 N. Y. 173; *Anderson* v. *Petereit*, 86 Hun, 600; *Flannery* v. *Sahagian*, 83 Hun, 109; *United States* v. *Robeson*, 9 Pet. 319, 327; *Chu Pawn* v. *Irwin*, 82 Hun, 607.) The complaint was rightly dismissed. (*M. F. S. Co.* v. *Mayor, etc.*, 13 App. Div. 235.) That affirmance of the judgment may result in hardship to the plaintiff, is no reason why it should not be affirmed. (*Donovan* v. *Mayor, etc.*, 33 N. Y. 291; *Laidlaw* v. *Sage*, 158 N. Y. 73.)

Vann, J. The main question presented for decision is whether the plaintiff can recover without making the floor of the boiler room absolutely water proof, even if it has conformed in every respect to the plan and specifications? The plaintiff insists that it has fully performed the contract, because it has furnished all the materials of the quality required, and has done all the work called for by the plan and specifications, while the defendant insists that performance is not complete because the plaintiff warranted that the plan and specifications when carried into effect would result in a water-proof boiler room, and that the boiler room is not water proof.

While the evidence would not compel, it would support a finding that the contract has been fully performed, unless the plaintiff guaranteed the sufficiency of the plan and specifications to produce absolute water-proof construction. The form of its promise was to furnish "the materials and labor for the purpose, and make water-tight the boiler room, etc.  *  *  * in the manner and under the conditions prescribed and set forth in the annexed specifications," and that it would turn the work over to the city "in perfect order and guaranteed absolutely water and damp proof for five years from the date of the acceptance of the work;" any dampness or water breakage within that time to be made good by the contractor without expense to the city. If this means that the plaintiff agreed to make the boiler room water tight by following the

plan and specifications, even if it could not be done in that way, it agreed to perform an impossibility, as the jury might have found. If, on the other hand, the meaning is that it agreed to make the boiler room water tight by following the plan and specifications, provided it could be done in that way, it has performed its contract, as we must assume for the purpose of this appeal.

The rule of reasonable construction governs courts in the enforcement of contracts. The contract now before us does not necessarily require the construction that the plaintiff guaranteed the sufficiency of the plan and specifications to produce the result desired, because it does not in terms so provide. There is no independent or absolute covenant to that effect. There is nothing in the subject of the contract, the situation of the parties or the language used by them, to conclusively indicate such an intention, and a fair and reasonable construction avoids such a peculiar and unjust result. The agreement is not simply to do a particular thing, but to do it in a particular way and to use specified materials, in accordance with the defendant's design, which is the sole guide. The promise is not to make water tight, but to make water tight by following the plan and specifications prepared by the defendant, from which the plaintiff had no right to depart, even if the departure would have produced a water-proof cellar. If the contractor had designed and executed a plan of its own, which resulted in a tight cellar, it would not have been a performance of the contract, for it was to produce a water-proof cellar by following the plan and specifications made by the defendant and not otherwise. The plaintiff was not allowed to do additional work, according to a plan of its own, although it claimed it would prevent all dampness, and the defendant did not attempt to remedy defects at the expense of the plaintiff, as authorized by the contract. There was no discretion as to the materials to be used or the manner in which the work should be done. The plaintiff had no alternative except to follow the plan under the direction of the defendant's officers in charge. The defendant relied upon the skill of its

engineer in preparing the plan, with the most minute specifications, and bound the plaintiff to absolute conformity therewith. . As was said in a similar case arising in Pennsylvania: "Every line was drawn, every grade was fixed and every detail was provided for by the city." (*Filbert* v. *Philadelphia*, 181 Pa. St. 530, 545.)

This is not the case of an independent workman, left to adopt his own method, but of one bound hand and foot to the plan of the defendant. The plaintiff had no right to alter the specifications, although the defendant had a qualified right to do so. . If the plan and specifications were defective it was not the fault of the plaintiff, but of the defendant, for it caused them to be made and it alone had the power to alter them. It relied upon its own judgment in adopting them, not upon the judgment of the plaintiff. It decided for itself out of what materials and in what manner the floor should be constructed, and not only required the plaintiff to use precisely those materials and to do the work exactly in that manner, but also inspected both as the work advanced without complaint or question as to either. "If," says Mr. Parsons, " the thing is itself specifically selected and ordered, there the purchaser takes upon himself the risk of its effecting its purpose." (1 Parsons on Contracts, 587.) The defendant specifically selected both material and design and ran the risk of a bad result. If there was an implied warranty of sufficiency, it was made by the party who prepared the plan and specifications, because they were its work, and in calling for proposals to produce a specified result by following them, it may fairly be said to have warranted them adequate to produce that result. If I agree to produce a certain result according to my own plan, I impliedly warrant its sufficiency ; but if I agree to produce that result by strictly following the plan prepared by another party, he impliedly warrants its sufficiency. The responsibility rests upon the party who fathers the plan and presents it to the other with the implied representation that it is adequate for the purpose to be accomplished. A stipulation requiring a contractor to produce a certain result by following the plan and directions of the owner

is an undertaking that it can be done in that way.    Interpreting their language in the light of surrounding circumstances, we do not think the parties meant that the plaintiff was to be responsible for a bad result unless there was some default on its part in doing the work or furnishing the materials, for, to use the language of a learned court in an analogous case, "It would certainly be regarded as most extraordinary to find that a contractor had undertaken to warrant the perfection of a plan which is designed by the person for whom he is to do the work, or the wisdom of directions given during the progress of the work by one whom he cannot control, but whose orders in the execution of the work he is, by the terms of the contract, bound to obey." (*MacRitchie* v. *City of Lake View,* 30 Ill. App. 393, 398.)

It would not be reasonable to hold the parties to have intended that the plaintiff was to do a great deal of work and furnish a large quantity of materials according to the specifications of the defendant and under the direction of its officers, with no right to vary from the materials or construction specified, and yet get no pay for it unless it produced a certain result, without very plain language to that effect, which we do not find in the instrument before us, although it is elaborate in form and embraces the most minute details.    Parties might make such an agreement, but if the language used admitted of a different construction the courts would be apt to adopt it and thus avoid the conclusion that an impossible result was intended.    The fault of the defendant's plan should not prevent the plaintiff from recovering payment for good work done and good materials furnished precisely as the defendant required.    The reasonable construction of the covenant under consideration is that the plaintiff should furnish the materials and do the work according to the plan and specifications, and thus make the floors water tight so far as the plan and specifications would permit.    This result finds support in the following authorities, some of which are precisely analogous while others sustain the principle adopted. (*Kellogg Bridge Co.* v. *Hamilton,* 110 U. S. 108 ; *MacRitchie* v. *City*

*of Lake View*, 30 Ill. App. 393; *Filbert* v. *City of Phila-delphia*, 181 Pa. St. 530; *Bancroft* v. *San Francisco Tool Co.*, 120 Cal. 228; *Bentley* v. *State*, 73 Wis. 416; *Cunningham* v. *Hall*, 86 Mass. 268; *Burke* v. *Dunbar*, 128 Mass. 499; *Perkins* v. *Roberge*, 39 Atl. Rep. 583; *Clark* v. *Pope*, 70 Ill. 128; *Rice* v. *Forsyth*, 41 Md. 389; *Weld* v. *Goldenberg*, 65 Fed. Rep. 466; *Smith* v. *Consumers' Cotton Oil Co.*, 86 Fed. Rep. 359; *Hoe* v. *Sanborn*, 21 N. Y. 552; *Byron* v. *Mayor, etc.*, 22 J. & S. 411.)

We have examined the cases relied upon by the respondent, but find none in serious conflict with the views thus expressed. *Thorn* v. *Mayor of London* (L. R. [1 App. Cas.] 120) is quite dissimilar in its facts as well as in the governing principle. Its peculiar and unique features are well set forth by the court in *Bentley* v. *State (supra)*.

Thus far we have discussed the promise to make "water tight" with which the contract opens, and we now come to the five-year guaranty clause near the close. The plaintiff agreed to turn the work over "in perfect order and guaranteed absolutely water and damp proof for five years," and to make good any dampness or water breakage during that period. This, as we think, applies to the material and workmanship, but not to the plan. It has reference to what the plaintiff was to do, not to what the plan would accomplish, and is predicated on the efficiency of the plan. The plaintiff was to execute the work according to the plan and to turn it over in perfect order, but to guard against latent defects he was required to protect the defendant against them for the period named. Any defect owing to poor workmanship, or bad materials, was to be made good. The guaranty, which became operative only upon acceptance of the work, did not relate to its condition when accepted. It required something to be done in the future provided it became necessary, not on account of a defective plan but of defective execution. It related only to the quality of the work and materials. The contract price was payable when the work was done, not at the end of five years, and payment would end all liability of

plaintiff on account of defective execution unless such a clause was inserted to cover defects not discovered. It was not a guaranty of the perfection of the plan, but of the materials and workmanship, and its effect was to make the plaintiff responsible for dampness or water breakage caused by such defects only. It required supplementary performance, if necessary, upon notice from the defendant, after acceptance and payment of the contract price.

We think the evidence presented a question of fact for the jury as to the sufficiency of the plan to produce the result desired, and as to performance of the contract when properly construed. If the work was faithfully performed according to the plan and specifications, and the failure to secure a watertight boiler room was wholly owing to the defective design of the defendant, the plaintiff would be entitled to recover notwithstanding the refusal of the superintendent to give the required certificate, for under those circumstances it would be his duty to give it and a refusal to do so would be unreasonable. (*Bowery National Bank* v. *Mayor*, 63 N. Y. 336; *Nolan* v. *Whitney*, 88 N. Y. 648; *Thomas* v. *Stewart*, 132 N. Y. 580, 586.)

The judgment should be reversed and a new trial granted, with costs to abide the event.

All concur, except Gray, J., dissenting.

Judgment reversed, etc.